UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Rubygold Main Holdings, LLC

      v.                                    Civil No. 20-cv-1006-JL
                                        Opinion No. 2021 DNH 104
Brian Gardner Carpentry, LLC


**MEMORANDUM ORDER**

As with Plaintiff's motion for preliminary injunction, the dispositive motions before the court test the bounds of the Anti-Injunction Act, 28 U.S.C. § 2283. The parties cross move for summary judgment on Count 2 of Plaintiff Rubygold Main Holdings, LLC's complaint, which seeks a declaratory judgment on competing claims of lien priority, quieting title to Rubygold's real property. Rubygold argues that the undisputed facts show that Defendant Gardner's mechanic's lien does not encumber the property because the mortgage by which Rubygold's predecessor took title to the property holds priority over the mechanic's lien, and seeks a declaration stating so. Gardner counters that the Anti-Injunction Act bars the requested declaration, and even if the Act does not bar the relief, Gardner should nonetheless prevail on the merits of the lien priority issue. Gardner also argues that it is entitled to judgment as a matter of law on Rubygold's remaining claims.[1]

This court has jurisdiction under 28 U.S.C. § 1332(a) (diversity) because Rubygold is a New York limited liability company and its sole member resides in New York, Gardner is a New

---

[1] See Gardner's Motion for Summary Judgment on All Counts (Doc. no. 49). Gardner previously moved to dismiss Rubygold's New Hampshire Consumer Protection Act (CPA) claim under Rule 12(b)(6), and that motion was pending when it filed its motion for summary judgment. See Doc. no. 11. The motion for summary judgment raises identical arguments, and

Hampshire limited liability company and its sole member resides in New Hampshire, and the amount in controversy exceeds $75,000. After careful review of the parties' submissions and hearing oral argument, the court denies Rubygold's motion and grants Gardner's motion as to Counts 1-3 and 6 of Rubygold's complaint. The threshold, but central, question on Rubygold's declaratory judgment claim is whether the requested declaration would have "essentially the same effect as an injunction." Gloucester Marine Railways Corp. v. Charles Parisi, Inc., 848 F.2d 12, 15 (1st Cir. 1988). Because it would, the Anti-Injunction Act bars the requested relief, and Gardner is entitled to summary judgment on this claim.

As for the remaining claims, Rubygold agrees that its declaratory judgment claim in Count 1 and permanent injunction claim in Count 3 are subject to dismissal as a result of the court's prior orders denying its motion for preliminary injunction.[2] Gardner's motion for summary judgment is therefore granted as to those claims. In addition, Gardner's motion for summary judgment is granted as to Rubygold's CPA claim because the alleged wrongful conduct does not rise to the level of severity required to establish a claim under the statute. Gardner's motion is denied, however, as to Rubygold's abuse of process and slander of title claims (Counts 4 and 5) because there are genuine disputes of material fact on several elements of each claim.

## I.    Applicable legal standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

_____

is based on essentially the same factual record, as the motion to dismiss, so the court deems the motion to dismiss moot and will evaluate the CPA claim under the summary judgment standard.

[2] See Doc. nos. 41 and 47.

R. Civ. P. 56(a).  A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial by a rational fact-finder, and "material" if it could sway the outcome under applicable law.  Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).  In analyzing a summary judgment motion, the court "views all facts and draws all reasonable inferences in the light most favorable to the non-moving party."  Id.

The parties have effectively cross-moved for summary judgment on Count 2 of Rubygold's complaint; however, "[c]ross motions for summary judgment do not change the standard."  Latin Am. Music Co. v. Archdiocese of San Juan of Roman Cath. & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007) (citing Specialty Nat'l Ins. Co. v. OneBeacon Ins. Co., 486 F.3d 727, 732 (1st Cir. 2007)).

## II.  **Background**

The following background facts – taken mostly from the parties' Joint Statement of Facts, Joint Timeline, and exhibits submitted with their briefing on Rubygold's preliminary injunction request – are relevant to the issues addressed in this motion and are undisputed or accepted, except where noted.

### A.  The parties and the property at issue

Rubygold is a New York limited liability company with an official address for service of process c/o Castiglia-Rubinstein & Associates, 445 Broadhollow Road, CL-10, Melville, New York 11747.[3]  Rubygold's sole member is Alexander Rubinstein, who resides in New York

---

[3] Joint Statement of Facts (doc. no. 27), at ¶ 1.

3

State.[4]  Rubinstein is also the sole member of Gates Road, NH Centaur Holding, LLC ("Centaur"), a New York limited liability company with the same official address for service of process as Rubygold.[5]  Rubygold owns property known as "5 Gates Road" in Etna, New Hampshire (the "Property").[6]

Gardner is a New Hampshire limited liability company with an address of 186 Etna Road, Etna, New Hampshire 03750.[7]  Gardner's sole member is Brian Gardner, who resides in New Hampshire.[8]

**B.  Gardner's work on the Property and Mascoma's loan**

In 2010, Arrien (a/k/a Adriaan) and Robin Schiltkamp owned the Property.  That year, the Schiltkamps hired Gardner to renovate a house on the Property and entered into a Construction Proposal and Contract for the construction project.[9]  Two and a half years into the project, the Schiltkamps financed a portion of the construction with a $2 million loan from Mascoma Savings Bank.[10]  To secure the loan, the Schiltkamps granted Mascoma a mortgage on

---

[4] Id. at ¶ 2.

[5] Id. at ¶ 3.

[6] Id. at ¶ 4.

[7] Id. at ¶ 5.

[8] Id. at ¶¶ 6-7.

[9] Id. at ¶ 8.

[10] Id. at ¶ 9.

the Property and recorded the mortgage at the Grafton County Registry of Deeds on November 7, 2012 at Book 3930 Page 0338 (the "Mascoma Mortgage").[11]

Mascoma disbursed money to Gardner as payment for invoices for its construction work on the project, and received mortgagor affidavits, as reflected in the following chart:[12]

| Gardner Invoice # | Invoice Date | Lien Waiver | Mortgagor Affidavit | Mascoma Payment | Check Date |
|---|---|---|---|---|---|
| 5/2148 | 2/6/2013 | No | 2/6/2013 | $301,634.53 | 2/8/2013 |
| 5/2158 | 3/28/2013 | No | 3/29/2013 | $459,060.27 | 4/1/2013 |
| 5/2167 | 5/17/2013 | No | 5/18/2013 | $405,173.46 | 5/20/2013 |
| 540782-06 | 7/15/2013 | No | 7/18/2013 | $300,000.00 | 7/19/2013 |
| Total: | | | | $1,465,868.26 | |

Accordingly, out of the $2,000,000 loan, Mascoma disbursed $1,465,868.26 to Gardner for its construction work on the Property.[13]

After July 2013, the Schiltkamps entered into other agreements with Gardner for additional construction work on the Property, with the same time and material terms as agreed to in the April 2010 contract.[14] Using funding sources other than the Mascoma loan, the Schiltkamps paid all invoices from Gardner for work performed between late-July 2013 and April 2014, and as of April 5, 2014 the Schiltkamps had a $17,211.91 credit with Gardner for the project.[15]

---

[11] Id. at ¶ 10; Ex. A.

[12] Doc. no. 27, at ¶¶ 11-12; Exs. B & O.

[13] Doc. no. 27, at ¶ 13.

[14] Id. at ¶ 14.

[15] Id. at ¶ 15.

Gardner performed additional work on the Property between April 2014 and June 2015 and invoiced the Schiltkamps for this work as follows:[16]

| 04/30/14 | Inv #05/2234, $219,693.48 |
|----------|---------------------------|
| 05/31/14 | Inv #05/2246, $114,189.40 |
| 12/29/14 | Inv #05/2328, $111,081.68 |
| 06/09/15 | Inv #05/2329, $27,724.20 |
| Total: | $472,688.76 |

The Schiltkamps partially paid these four invoices and applied their $17,211.91 credit, leaving a balance due of $245,476.85. Gardner acquired a mechanic's lien for this unpaid work.[17]

**C. Gardner's suit to perfect its mechanic's lien and the 2015 recorded letter**

In June of 2015, Gardner sued the Schiltkamps in Grafton County Superior Court to collect the unpaid balance due for the construction project and perfect its mechanic's lien.[18] Gardner obtained a writ of attachment to perfect its mechanic's lien[19] in the amount of

---

[16] Id. at ¶¶ 16-17.

[17] Id. at ¶ 18.

[18] Id. at ¶ 19; Ex. D. In this order, the court collectively refers to Gardner's suit in Grafton County Superior Court as the "state court case" or "state court litigation."

[19] "Those who perform work or provide materials for construction have the statutory right to a 'mechanic's lien' in their work to secure payment." 17 NEW HAMPSHIRE PRACTICE: REAL ESTATE § 4.03 (2021); see also RSA 447:2 (creating a lien, or a legal right or interest, that secures payment for performing "labor, provid[ing] professional design services, or furnish[ing] materials to the amount of $15 or more for erecting or repairing a house or other building or appurtenances"); Daniel v. Hawkeye Funding Ltd. P'Ship, 150 N.H. 581, 583 (2004) ("[I]t is the provision of labor or materials that creates a mechanic's lien . . . as soon as any work or materials are furnished under the contract, increasing in amount according to the progress of the work until performance is completed.").

$245,476.85 and recorded the writ on or about July 9, 2015 at Book 4142, Page 0959 of the Grafton County Registry of Deeds.[20]

Several months after obtaining its writ of attachment, on November 13, 2015 Gardner recorded a letter from its counsel to Mascoma's counsel (the "2015 Letter") in the Grafton County Registry of Deeds.[21] The 2015 Letter appears to be Gardner's response to an e-mail from Mascoma's counsel setting forth Gardner's legal position that its mechanic's lien held priority over Mascoma's mortgage. The letter stated, in part, that:

> So that prospective purchasers are not misled, we urge you to make clear to all bidders that the successful bidder will take the property subject to [Gardner's] secured mechanics lien and attachment of $245,476.85. We will also be recording a copy of this letter in the Grafton County Registry of Deeds.[22] (emphasis and alteration in original)

On October 19, 2016, Judge MacLeod of the Grafton County Superior Court issued an order in the state court case entering default judgment for Gardner in the amount of $382,848.54 plus costs and interest.[23] The order noted that a "taxation of costs will be issued by the clerk once this order becomes final."[24]

---

[20] Doc. no. 27, at ¶ 20; Ex. E.

[21] Doc. no. 27, at ¶ 21.

[22] Ex. HH, Doc. no. 38-43, at 3.

[23] Doc. no. 27, at ¶ 22. It is unclear from the parties' submissions how the amount of Gardner's claim increased from $245,476.85 to $382,848.54 during the state court litigation. At oral argument, Gardner's counsel suggested that interest increased the amount. But there is no evidence in the record of accrued interest in any amount, let alone the substantial amount alleged here.

[24] Ex. F.

## D.  The Schiltkamp bankruptcy and Mascoma's relief from stay

On October 31, 2016, less than 30 days after the state court's default judgment order, the Schiltkamps filed a Chapter 11 Petition in the United States Bankruptcy Court for the Southern District of New York, which later converted to a Chapter 7 liquidation proceeding.[25]  Mascoma moved for relief from the automatic stay in order to pursue a foreclosure sale of the Property.[26] In August 2017, the Bankruptcy Court endorsed a stipulated order terminating the automatic stay as to Mascoma.[27]  The order provided in part that the "automatic stay of Bankruptcy Code § 362(a) shall be terminated as against Mascoma with respect to the Etna Property to permit Mascoma, its successors and assigns, to foreclose the Mortgage or otherwise avail itself of its available state law rights and remedies with respect to the Mortgage and Etna Property."[28]

## E.  The 2017 recorded letter

On October 4, 2017, just days before the scheduled foreclosure sale of the Property, Gardner recorded a second letter (the "2017 Letter") with the Grafton County Registry of Deeds, in response to another e-mail from Mascoma's counsel.[29]  The 2017 Letter maintained Gardner's position that its mechanic's lien had priority over Mascoma's mortgage, but referenced and attached Gardner's filings in the Schiltkamp bankruptcy as supporting this position in more

---

[25] Doc. no. 27, at ¶¶ 23-24; Ex. G.

[26] Id. at ¶ 30.

[27] Ex. H.

[28] Id.

[29] Doc. no. 27, at ¶ 32; Ex. HH, doc. no. 38-44, at 12.

detail.[30]  The 2017 Letter also purported to "withdraw" the 2015 Letter,[31] though there is no evidence that Gardner or its counsel actually recorded a discharge of the 2015 Letter in the Registry.  In fact, the recorded version of the 2017 Letter included a copy of the 2015 Letter (recorded at Book 4315, Page 0967), so both letters remained recorded on the registry.[32]

**F.  Mascoma's foreclosure sale and subsequent transfers of the Property**

After obtaining relief from the automatic stay, Mascoma conveyed the Property by "Foreclosure Deed Under Power of Sale" to Centaur on November 21, 2017.[33]  Centaur paid $300,000.00 for the Property, and the sale was subject to "all existing liens taking precedence over the mortgage referred to herein."[34]  As a result of Centaur's failure to pay property taxes, the Town of Hanover acquired title to the Property through a Tax Collector's Deed.[35]  Centaur, however, retained redemption rights in the Property under RSA 80:89.[36]  On December 17, 2018, Centaur assigned its redemption rights in the Property to Rubygold.[37]  The Town of Hanover

---

[30] Doc. no. 38-44, at 12.

[31] Id. at 13.

[32] Id. at 17.

[33] Id. at ¶ 33; Ex. I.

[34] Ex. I at 86.

[35] Doc. no. 27, at ¶ 36; Ex. L.

[36] Doc. no. 27, at ¶ 37.

[37] Id. at ¶ 38.

later conveyed the Property to Rubygold via a "Deed with No Covenants," and "subject to any liens of record against the property as of the time of the tax deed to the Town of Hanover . . . ."[38]

## G. Gardner's efforts to obtain and enforce a writ of execution against Rubygold

In March 2019, Gardner moved to re-open the state court case and moved for entry of a Writ of Execution.[39] By order dated April 2, 2019, Superior Court Judge Bornstein re-opened the case and ordered Gardner to "furnish a copy of the [motion for a writ of execution] to [Rubygold] and certify it has done so."[40] Gardner sent the motion and Superior Court's order to Rubygold by certified mail, return receipt requested to its address listed above.[41] On April 25, 2019, a representative of Rubygold signed for the certified mail package.[42] Gardner's counsel then certified to the state court that it had furnished a copy of the motion for writ of execution to Rubygold. Rubygold did not appear in the state court case at that time, and Rubenstein claims that he has "no recollection" of receiving a copy of the package.[43]

By order dated March 9, 2020, Superior Court Judge MacLeod directed Gardner to submit a "proposed order for the court's consideration."[44] A day later, Gardner submitted a proposed order on its motion for writ of execution, a proposed Writ of Execution, and a sample

---

[38] Id. at ¶ 39; Ex. M.

[39] Doc. no. 27, at ¶ 41; Exs. W & X.

[40] Ex. Y.

[41] Ex. Z.

[42] Id.

[43] Ex. C, at ¶ 8.

[44] Doc. no. 27, at ¶ 45

writ of execution that Gardner's counsel had allegedly used in a different matter.[45] The proposed Writ of Execution did not identify the Property as owned by the Schiltkamps or Rubygold, but instead ordered the Sheriff to "levy the lands known as 5 Gates Road, Hanover, NH," without identifying the property owner or referencing the fact that the Schiltkamps were the judgment debtors in the state court case.[46]  Several months passed, and on July 7, 2020, the Superior Court granted Gardner's motion for writ of execution and issued the proposed order submitted by Gardner (the "July 7 Order").[47]  It then issued a Writ of Execution on August 18, 2020,[48] but the Writ did not track the proposed writ submitted by Gardner.  Instead, it ordered the Sheriff to "levy the lands, personal estate, property interest, right or credit of Arrien L.C. Schiltkamp; Robin Schiltkamp to the extent allowed by the Court in its order of July 7, 2020, and pay to Brian Gardner Carpentry, LLC the amount stated below with interest."[49]

On August 23, 2020, Gardner's counsel sent a letter to Rubygold enclosing the July 7 Order.[50]  In the letter, counsel stated that he intended to submit the writ of execution to the Sheriff to institute a Sheriff's sale of the Property, unless Rubygold committed to paying Gardner

---

[45] Ex. DD.

[46] Id.

[47] Ex. J.

[48] Ex. Q.

[49] Id.

[50] Ex. J.

the sum of $443,811.68.[51]  Several days later, counsel for Rubygold acknowledged receipt of

Gardner's August 23 letter, rejected Gardner's demand for payment, and argued that Gardner's

plans to institute a Sheriff's sale were improper for several reasons.[52]  Rubygold did not appear

in the state court case at that time.  Gardner's counsel did not send the court-issued Writ to the

Sheriff to initiate a Sheriff's sale of the Property, but solicited the Sheriff's Office's input on how

to appropriately change the description of the Property in the Writ in order for it to be effective.[53]

## H.  Procedural history of this lawsuit

Rubygold filed its complaint in this action on October 2, 2020.[54]  It also moved for a

preliminary injunction.[55]  After substantial briefing and pre-hearing submissions on Rubygold's

motion for a preliminary injunction, the court held a hearing on the motion on January 8, 2021.

At the hearing, Gardner's counsel indicated that he intends to return to the Grafton County

Superior Court to request an amended, corrected, Writ of Execution.  It is unclear if he has taken

steps to request an amended, corrected Writ.   While its motion for preliminary injunction was

under advisement, Rubygold filed its partial motion for summary judgment on Count 2.[56]

Shortly thereafter, the court issued its order denying Rubygold's motion for preliminary

---

[51] Id.  As with the increased state court judgment amount, it is unclear how Gardner arrived at such a high demand figure, considering that its writ of attachment secured a mechanic's lien in the amount of $245,476.85.  See Ex. E.

[52] Ex. N.

[53] Doc. no. 27, at ¶ 52.

[54] Complaint (doc. no. 1).

[55] Rubygold's Mot. for Prelim. Injunction (doc. no. 4).

[56] Doc. no. 40.

injunction.[57]  Following that, Rubygold did not move to intervene or otherwise appear in the state court case.

Gardner filed its motion for summary judgment on March 8, 2021.  Due to the flurry of initial motions, the court has not held a preliminary pretrial conference and the parties have not submitted a proposed discovery plan and case schedule.  It appears, however, that the parties have conducted some written discovery, but have not yet taken any depositions.  Despite the substantial motion practice thus far, the case therefore remains in the early stages and has not been set for trial.

III.  **Analysis**

Rubygold asserts three claims for equitable relief (Counts 1-3) and three claims for damages (Counts 4-6) and, in response to Gardner's motion for summary judgment, has agreed to dismiss its claims for declaratory judgment in Count 1 and permanent injunctive relief in Count 3.  The court first addresses the parties' cross-motions for summary judgment on Count 2 and then addresses (see Section III, B, supra) Gardner's arguments for dismissal of Rubygold's remaining claims.

**A.  Count 2 - Declaratory Judgment**

In Count 2, Rubygold seeks declaratory relief under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.  Specifically, it alleges that there is an actual controversy between the parties about the effect of Gardner's mechanic's lien on Rubygold's property and asks the court to "declare that [Gardner's] $245,00[0].00 mechanic's lien dated July 13, 2015 and recorded at

---

[57] Doc. no. 41; see also Summary Clarifying Order, doc. no. 47.

Book 4142, Page 0959 of the Grafton County Registry of Deeds does not encumber Plaintiff's Property, thereby quieting title to the Property."[58] Rubygold argues that based on the undisputed facts, the mortgage by which it took title to the Property holds priority over Gardner's mechanic's lien. In response, Gardner argues that the court should not reach the merits of the lien priority question because the Anti-Injunction Act bars Rubygold's requested declaratory judgment. Gardner further argues that its mechanic's lien holds priority over the mortgage as a matter of law.

The court begins by addressing whether the Anti-Injunction Act bars the requested declaratory judgment. As detailed below, because the requested declaration would have essentially the same effect as an injunction, the court finds that the Anti-Injunction Act bars the relief sought in Count 2. Moreover, while the Anti-Injunction Act alone serves as a sufficient basis to deny Rubygold's declaratory judgment request, given the parallel proceedings in state court, the court also exercises its discretion to deny the requested relief.

### 1. Anti-Injunction Act

The court discussed the Anti-Injunction Act at length in its order denying Rubygold's motion for preliminary injunction and will not repeat that discussion here. Similarly, the court reiterates its finding that Rubygold is not a stranger to the state court proceeding and therefore not exempt from the Anti-Injunction Act.[59] The relevant question for purposes of this order is

---

[58] Doc. no. 1, at ¶¶ 52-53.

[59] See doc. no. 41, at 15-27; Summary Clarifying Order (doc. no. 47). The court also finds that none of the other exceptions to the Anti-Injunction Act apply to Rubygold's declaratory judgment claim because the declaratory judgment is not "necessary in aid of [the district court's] jurisdiction" or "to protect or effectuate [the district court's] judgments." 28 U.S.C. § 2283. Nor is the Declaratory Judgment Act an "Act of Congress" that "expressly authorize[s]" injunctions against state court proceedings. Id.; see also Goss v. Illinois, 312 F.2d 257, 259 (7th Cir. 1963)

whether the requested declaratory judgment is the type of equitable relief that is barred by the Act.

Rubygold argues that because a declaratory judgment is not technically an injunction, and does not have the same enforcement mechanisms as an injunction, it cannot be barred by the Act. The label placed on the equitable relief, however, is not dispositive. And the question is not whether a declaratory judgment or other equitable relief would be identical to an injunction in all respects, including its enforcement mechanisms. Instead, "if a declaratory judgment would have essentially the same effect as an injunction, it should be refused if the injunction would be barred by § 2283." Gloucester Marine, 848 F.2d at 15 (quoting 17 CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 4222 (2d ed. 1987)); see also Martingale LLC v. City of Louisville, 361 F.3d 297, 303 (6th Cir. 2004) ("[W]here, as here, declaratory relief would have the same practical effect as an injunction, the Anti–Injunction Act precludes the court from granting a declaratory judgment."); Texas Employers' Ins. Ass'n. v. Jackson, 862 F.2d 491, 506 (5th Cir. 1988) ("Accordingly, we follow the weight of authority in holding that '[i]f an injunction would be barred by § 2283, this should also bar the issuance of a declaratory judgment that would have the same effect as an injunction.").[60]

_____

(finding that the Declaratory Judgment Act did not satisfy the "act of Congress" exception to the anti-injunction statute); Benson v. Family Tree Cop., No. 17-3839, 2017 WL 11569192, at *1 (D. Minn. Oct. 2, 2017) ("the statute under which Plaintiff seeks relief, the Declaratory Judgment Act, does not come within the [Anti-Injunction Act's] expressly authorized exception") (quotations omitted).

[60] The Supreme Court has long observed that "for at least two reasons," ordinarily, "a declaratory judgment will result in precisely the same interference with and disruption of state proceedings that the long-standing policy limiting injunctions was designed to avoid." Samuels v. Mackell, 401 U.S. 66, 72 (1971). Relevant here, one of those reasons is that "even if the declaratory

Gloucester Marine is instructive. There, the plaintiff brought an action in federal court seeking a declaration that a state court tort judgment obtained against it was unenforceable, a declaration that its insurers were responsible for any outstanding portion of the judgment, and an injunction preventing the plaintiff in the state court case from enforcing the state court judgment. 848 F.2d at 13. After the district court "declared the judgment satisfied and enjoined its further enforcement," the defendant (and plaintiff in the state court case) appealed, and the First Circuit Court of Appeals reversed, ruling sua sponte that the Anti-Injunction Act barred both the injunction and the declaration.

As for the declaratory judgment issued by the district court (that the state court judgment had been satisfied), the court held that it had "essentially the same effect as an injunction against enforcing the judgment beyond $45,000." Id. at 15. This declaration would have been useful to the plaintiff (and defendant in the state court case) "primarily, if not exclusively, as the basis for seeking an injunction in state court against further enforcement of the judgment." Id. Because "[s]uch an effort would produce the very friction between state and federal courts that the Act is designed to avoid," the court held that the Act barred the declaratory judgments even if they were not labeled "injunctions." Id.

The same is true here. Rubygold's requested declaration that Gardner's mechanic's lien does not encumber the Property would effectively halt any proposed Sheriff's sale and render ineffective the existing writ of execution and any future writ obtained by Gardner in state court. The declaration would therefore have essentially the same effect as an injunction against

judgment is not used as a basis for actually issuing an injunction, the declaratory relief alone has virtually the same practical impact as a formal injunction would." Id.

enforcing Gardner's state court judgment and pursuing a Sheriff's sale. Rubygold conceded as much at oral argument and in its summary judgment filings, where it recognized that while Gardner could still conduct a Sheriff's sale, it would be "bound to the determination [as a result of the federal declaratory judgment] that the Sheriff's deed conveys no property."[61] In other words, the Sheriff's deed would be worthless.[62] It is hard to imagine anyone in Gardner's position conducting a sale under those circumstances. It is similarly unlikely that anyone would purchase a property encumbered by such a declaration.

One of Rubygold's counsel also conceded at oral argument that if it obtained the requested declaration, it would (as the court theorized in Gloucester Marine) use that declaration as the basis for seeking an injunction in state court, presumably to prevent the Sheriff's sale and further enforcement of Gardner's judgment. Rubygold's other counsel later interjected and contradicted his co-counsel, stating that they would not intervene and seek an injunction in the state court case and would simply record the declaratory judgment. He further noted that Rubygold would not need to enjoin the Sheriff's sale because, after the declaration, a Sheriff's sale would not convey anything with respect to the Property. But that proves exactly why the Anti-Injunction Act bars the requested declaration. A recorded declaratory judgment would have practically the same effect as nullifying or preventing the Sheriff's sale through an injunction. And Rubygold would use the declaratory judgment the same way as it would use an injunction –

---

[61] Rubygold's Reply Memo. in Supp. of Mot. for Summ. J. (Doc. no. 52) at 11.

[62] See doc. no. 52 at 12 ("Ultimately, when the declaratory judgment enters, [Gardner] will be deprived of its claimed prize"). Rubygold's counsel candidly admitted at oral argument that it could not imagine Gardner's counsel proceeding with a Sheriff's sale in the face of the requested declaration and did not think "anyone would hold the sale" under that scenario.

to prevent the Property's sale. A party cannot avoid the Anti-Injunction Act's prohibitions by pursuing a remedy with essentially the same effect and purpose as an injunction, under a different name. See Martingale LLC, 361 F.3d at 303 ("Martingale and Bridge the Gap's argument is clever, but unpersuasive. Their ultimate goal is to halt the state court condemnation proceedings, a result that either an injunction or a declaratory judgment would accomplish equally well").

Rubygold offers several additional arguments as to why the Anti-Injunction Act does not bar this court from issuing a declaratory judgment as to lien priority, none of which persuade the court. First, Rubygold argues that Gloucester Marine is distinguishable because the plaintiff in Gloucester Marine was a defendant in the state court litigation, whereas Rubygold is not an actual party to the state court case here. This is a distinction without a difference because the court has already determined that Rubygold is in privity with a party to the state court case, and not a stranger to that case, for purposes of the Anti-Injunction Act.[63] No final judgment has been entered in the state court case, the court re-opened the case in early 2019, and the Act applies "to any proceeding supplemental or ancillary taken with a view to making the suit or judgment effective," such as a motion for writ of execution. Id. at 15 (quoting Hill v. Martin, 296 U.S. 393, 403 (1935)).

Rubygold further argues that its requested declaration would not conflict with the state court because the July 7 Order "is silent on priority."[64] This argument is misplaced for several reasons. First, it misconstrues the July 7 Order, which not only addressed the lien priority

---

[63] See doc. no. 41, at 19-24.

[64] Doc. no. 52, at 14.

question, but found in Gardner's favor on this question. See July 7 Order (doc. no. 4-2, at 72), at ¶ 3 and p. 4. A declaration from this court containing the opposite conclusion would therefore directly conflict with the state court order and put this court in the position of a de facto appellate court for the New Hampshire Superior Court; a position it cannot occupy. It would also "produce the very friction between state and federal courts that the [Anti-Injunction Act] is designed to avoid." Gloucester Marine, 848 F.2d at 15; see also Garrett v. Hoffman, 441 F. Supp. 1151, 1157 (E.D. Pa. 1977) (stating that avoiding potential conflicts between state and federal court judgments is "at least an implicit purpose of" the Anti-Injunction Act).

Rubygold counters that the July 7 Order should not be credited because Superior Court Judge MacLeod simply endorsed a proposed order submitted by Gardner, and Rubygold was not allowed to participate in the litigation leading up to that order. Neither point is accurate. While the July 7 Order is derived from Gardner's proposed order, the Superior Court held two hearings on Gardner's motion[65] and initially denied the motion before reconsidering and granting it. Also, significant time passed between Gardner's filing of the motion and the court's issuance of the July 7 Order. It thus appears that Judge MacLeod considered the merits of Gardner's motion before issuing the order. See Doc. no. 4-2, at 72. The court is therefore wary to issue a declaratory judgment that would directly conflict with, and interfere with the enforcement of, the state court's July 7 Order.

---

[65] The Superior Court held the two hearings after it had ordered Gardner to notify Rubygold of the motion. Gardner complied with the order by sending copies of the pleadings by certified mail to Rubygold's registered address, where someone signed for the package on Rubygold's behalf. If Superior Court considered this notice insufficient, it could have required Gardner to take additional steps to notify Rubygold prior to issuing the July 7 Order. But it did not. The court therefore disagrees that Rubygold was somehow not allowed to participate in the writ of execution litigation.

In addition, Rubygold contends that the state court is not an adequate forum for its claims because it does not have an absolute right to intervene in the state court case. The court agrees that intervention is discretionary, but Rubygold's entitlement to intervention here appears to be both warranted and timely, as there has been no final judgment in the state court case. See N.H. Super. Ct. R. 15 ("Any person shown to be interested may become a party to any civil action upon filing and service of an Appearance and pleading briefly setting forth his or her relation to the cause; or, upon motion of any party, such person may be made a party by order of court notifying him or her to appear therein."); Snyder v. NH Savings Bank, 134 N.H. 32, 35 (1991) ("[A] person who seeks to intervene in a case must have a right involved in the trial and his interest must be 'direct and apparent; such as would suffer if not indeed be sacrificed were the court to deny the privilege.'" (quoting R. Wiebusch, 4 NEW HAMPSHIRE PRACTICE, CIVIL PRACTICE AND PROCEDURE § 176, at 129–30 (1984)) (emphasis in original)). Rubygold is clearly interested in the result of Gardner's suit against the Shiltkamps and has a significant right – its property – involved in that suit. The Superior Court has also already recognized Rubygold's right in the suit by ordering Gardner to notify Rubygold of Gardner's motion for writ of execution. Rubygold would seem to be an ideal candidate for intervention.

Rubygold's counsel suggests that it filed suit in federal court because it is an out of state party, implying (but never expressly arguing) that a New Hampshire state court may not be impartial to a foreign company. Rubygold has not provided any evidence to suggest that it would not receive fair and impartial treatment in the Grafton County Superior Court, and its characterization as a New Hampshire outsider rings hollow because it owns property in this state. The court is wholly unpersuaded that a New Hampshire state court would not fairly and

impartially adjudicate the rights of one of its own property owners, or any other litigant that comes before it.

Finally, this is not a situation where the state court would be addressing a unique issue of federal law, making declaratory relief in federal court potentially proper.  See Thiokol Chemical Corp. v. Burlington Industries, Inc., 448 F.2d 1328, 1332 (3d Cir. 1971).  Unlike Thiokol Chemical, where the state court was asked to address the uniquely federal issues of validity and infringement of patents, which it was not optimally equipped to handle, the Superior Court here would be addressing (and has already addressed in the July 7 Order) competing claims of lien priority under state law.  These are common issues in the New Hampshire state court system and its judges are the judicial officials best equipped to handle them.[66]  Because Rubygold's requested declaratory judgment would have essentially the same effect as an injunction, the remedy is barred by the Anti-Injunction Act.

## 2. Discretion to deny declaratory judgment

As Rubygold's counsel noted at oral argument, a declaratory judgment is a discretionary remedy, and the exercise of discretion here also counsels against issuing the requested declaration.  The Declaratory Judgment Act provides that a court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief

---

[66] At oral argument, Rubygold's counsel also suggested that, if the court issued the requested declaration, Gardner could do "exactly" what the mechanic's lienholder did in L.M. Sullivan Co. v. Essex Broadway Sav. Bank, 117 N.H. 985, 991, 380 A.2d 1087, 1091 (1977).  That case, however, presented an entirely different set of facts and procedural posture than this case.   In L.M. Sullivan, the foreclosure sale and the Sheriff's sale both happened before any court had ruled on lien priority.  The mechanic's lienholder was therefore not in a position to move ahead with the Sheriff's sale in the face of a court order saying it held no lien right in the property to be sold, as Rubygold suggests Gardner could do here.  L.M. Sullivan does not help Rubygold.

is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201(a) (emphasis added).  Courts have "broad discretion to decline to enter a declaratory judgment," even where they otherwise have valid jurisdiction.  DeNovellis v. Shalala, 124 F.3d 298, 313 (1st Cir. 1997) (citing Wilton v. Seven Falls Co., 515 U.S. 277, 287 (1995) (noting the Act's "textual commitment to discretion")).  "In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration."  Wilton, 515 U.S. at 288.

Thus, regardless of whether the Anti-Injunction Act bars the requested relief here, this court may nevertheless decline to exercise its otherwise valid jurisdiction "where a declaratory judgment is sought regarding an issue currently pending in a state court action."  DeNovellis, 124 F.3d at 313; see also Flectat Ltd. v. KASL Seabreeze, LLC, 257 F. Supp. 3d 152, 156 (D. Mass. 2017) ("[T]he Supreme Court has held that a substantially lower discretionary standard applies with regard to claims brought pursuant to the Declaratory Judgement Act when there exists a pending parallel state court proceeding.").

In Brillhart v. Excess Ins. Co. of America, 316 U.S. 491 (1942), the Supreme Court highlighted several factors "governing the district court's exercise of [its] discretion" to dismiss a federal declaratory judgment action.  Wilton, 515 U.S. at 282, 288 (citing the Brillhart factors approvingly).  Those factors include: (1) the scope of the pending state court proceeding and the nature of defenses open there; (2) whether the claims of all parties in interest can be adjudicated satisfactorily in the state proceeding; (3) whether necessary parties have been joined; (4) whether all necessary parties are amenable to process in the state proceeding; and (5) the virtue of avoiding uneconomical proceedings, vexatious proceedings, and gratuitous interference by a

22

federal court with an orderly and comprehensive suit pending in a state court.  See Wilton, 515 U.S. at 283.  Ultimately, the question is whether the issues "in controversy between the parties to the federal suit, and which are not foreclosed under the applicable substantive law, can better be settled in the proceeding pending in the state court." Brillhart, 316 U.S. at 495.

The balance of the Brillhart factors weigh against issuing Rubygold's requested declaration.  Of particular importance, the same central issues (lien priority, Gardner's entitlement to a writ of execution on Rubygold's property, and enforceability of the writ of execution) are in dispute in both cases.  See Flectat, 257 F. Supp. 3d at 157 ("[S]tate and federal proceedings are considered parallel 'where substantially the same parties are contemporaneously litigating substantially the same issues' and there is a 'substantial likelihood that the state litigation will dispose of all claims presented in the federal case.'") (quoting Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Mar. Terminal, Inc., No. CIV.A. 14-14541-DJC, 2015 WL 3952766, at *3 (D. Mass. June 29, 2015)).  The state court has already ruled on lien priority and authorized a writ of execution in its July 7 Order.  The requested declaration in this court would directly contradict and essentially overturn that decision.  Because the nature of the issues in the federal and state cases are similar and there is a sufficient nexus between the cases, these factors weigh against issuing the declaration.

In addition, while Rubygold is not yet a party to the state case, "an identity of parties is not required for proceedings to be considered parallel," and Rubygold has "available procedural vehicle[s]" (intervention, motions to vacate prior orders, motions for reconsideration, or appeals to the New Hampshire Supreme Court, if needed) to resolve the overlapping issues and protect its rights in state court.  Nat'l Union Fire Ins., 2015 WL 3952766 at *4 (internal citation omitted).  Moreover, Gardner is already a party to the state court case and amenable to

proceeding there. While Rubygold prefers to litigate these issues in federal court, it acknowledges that it could have just as easily filed this same lawsuit in state court and proceeded there (and still can). Its decision to file in federal court was purely strategic.[67] Yet with no unique issue of federal law presented here, and no special interest in this court resolving Rubygold's claims, Rubygold's attempt to gain a tactical advantage or avoid some unarticulated unfairness or partiality of the Grafton County Superior Court (a concern this court considers unfounded) by filing suit in federal court does not carry the day. Because the necessary parties are amenable to proceeding in state court, this factor also favors declining to issue the declaration.

Finally, "considerations of practicality and wise judicial administration" weigh against issuing the requested declaration and proceeding with parallel proceedings in state and federal court. Wilton, 515 U.S. at 288. Importantly, "the absence of any question of federal law here eliminates a potential federal interest in entertaining this case sufficient to override the inefficiencies of dual proceedings." Haley & Aldrich, Inc. v. Specialty Technical Consultants, Inc., 158 F. Supp. 3d 16, 19 (D. Mass. 2016) (holding that the absence of issues of federal law weigh in favor of denying a federal declaration, even when the federal action is filed first); see also Nat'l Union Fire Ins., 2015 WL 3952766, at *6 ("The absence of any issue of federal law weighs in favor of staying this action"); Flectat, 257 F. Supp. 3d at 158 (same). Thus, the fifth

_____

[67] Rubygold's counsel suggested at oral argument that the tactical decision was whether to intervene in the state court case or file suit in federal court, and ultimately, Rubygold chose to file suit in this court because it did not believe the lien priority question was adequately "tee'd up" in the state court case. Counsel later acknowledged, however, that his decision to file suit in federal court was driven by a client who "[did] not care to be in the Grafton County if it [could] help it," and not necessarily or solely by whether certain issues were ripe for decision in state versus federal court.

24

Brillhart factor – the avoidance of uneconomical proceedings, vexatious proceedings, and gratuitous interference by a federal court – also supports denying Rubygold's request for a declaratory judgment. Rubygold's motion for summary judgment on Count 2 is therefore denied and Gardner's motion for summary judgment on this claim is granted. Gardner is entitled to judgment as a matter of law on Count 2 of Rubygold's complaint.

**B. Rubygold's remaining claims**

In addition to its claims for equitable relief, Rubygold has brought three claims for damages against Gardner: abuse of process, slander of title, and violation of the New Hampshire Consumer Protection Act. Gardner has moved for summary judgment on each of these claims. It first argues that all three claims are barred by the Anti-Injunction Act because the relief sought is practically the same as an injunction. The court summarily rejects this argument because a claim seeking damages does not, as a matter of law, seek the same practical remedy as an injunction, and Gardner cites no authority stating otherwise. The court addresses Gardner's other arguments for dismissal of each claim in turn and ultimately, it denies Gardner's motion as to Counts 4 and 5, but grants it as to Count 6.

**1. Count 4 – Abuse of process**

Gardner argues that on the present factual record, Rubygold cannot meet any of the elements of an abuse of process claim. The court disagrees. To prove an abuse of process claim, Rubygold must show that: "(1) [Gardner] used (2) legal process, whether criminal or civil, (3) against [Rubygold], (4) primarily to accomplish a purpose for which it is not designed, and (5) caused harm to [Rubygold] (6) by the abuse of process." New England Backflow, Inc. v. Gagne, 172 N.H. 655, 672 (2019) (citing Tessier v. Rockefeller, 162 N.H. 324, 335 (2011)). Rubygold

alleges that Gardner has used – and continues to threaten to use – a writ of execution to accomplish a purpose for which it is not designed, which has caused harm to Rubygold.

Gardner asserts that it did not "execute" legal process against Rubygold because the Grafton County Superior Court did not issue the writ Gardner requested and the issued writ does not list Rubygold as the property owner.[68]  This argument misstates the required elements of an abuse of process claim and ignores facts in the record.  "Execution" of legal process is not an element of the claim, so whether or not Gardner sent the writ to the Sheriff to conduct a sale is not dispositive.  Gardner moved for and obtained a writ of execution, a form of legal process.  It then "used" that writ – according to Rubygold – for an improper purpose, that is, attempting to extract a $443,811.68 payment out of Rubygold.  And Rubygold has allegedly been damaged by having to incur attorneys' fees to combat or undo these actions.

Gardner further argues that it used the writ for precisely the purpose for which it was designed, that is, to enforce its lien.  While Gardner might ultimately prove at trial that it did not have an "ulterior purpose" for using the writ against Rubygold, the summary judgment record reveals genuine disputes regarding this material issue, precluding summary judgment for Gardner on the abuse of process claim.  New England Backflow, Inc., 172 N.H. at 672.  The court cannot accept Gardner's attorney's unsworn statement as to his purpose or motives in using the writ, particularly when Rubygold disputes that purpose.  Issues of intent or purpose are generally not suitable for summary judgment rulings, and there are other facts in the record calling this purpose into question.  These include, for example, the fact that Gardner demanded payment from Rubygold for the Shiltkamps' judgment, in an amount that exceeded the amount

---

[68] See doc. no. 50, at 15-16.

of its mechanic's lien by almost $200,000, did not include a copy of the issued writ with its demand letter, and tried to use a writ against Rubygold that did not even name Rubygold. Gardner's motion for summary judgment on Count 4 is accordingly denied.

### 2. Count 5 – Slander of Title

Gardner also seeks summary judgment on Rubygold's slander of title claim because the undisputed factual record does not establish that Gardner intentionally and maliciously published a false claim on Rubygold's title that caused damages to Rubygold. See Mullen v. Public Service Co. of N.H., No. 2014-0797, 2015 WL 11071989, at *3 (N.H. July 16, 2015) (reciting elements of abuse of process claim). While Gardner's arguments have some superficial appeal, and there are elements of Rubygold's slander of title claim – namely, whether Gardner acted maliciously – that appear thinly supported, the summary judgment record reveals genuine disputes regarding these material issues, precluding summary judgment for Gardner on this claim.

It is undisputed that Gardner, through counsel, published statements about Rubygold's predecessor-in-title when it recorded the 2015 and 2017 letters with the Grafton County Registry of Deeds. See 39 A.L.R.2d 840, § 2 ("The wrongful filing for record of a document which casts a cloud upon another's title to or interest in realty is clearly such an act of publication as to give rise to an action for slander of title, if provable damages result."). There are genuine disputes, however, as to whether Gardner's statements in those letters were false, whether Gardner recorded the letters with malice, and whether Rubygold has been damaged by the letters.

As for falsity, if it is later determined that Mascoma's mortgage held priority over Gardner's mechanic's lien, Gardner's contrary statements in its letters could be deemed false. Summary judgment is therefore not only unwarranted due to factual disputes as to the falsity of the statements, but it is also premature.

27

Likewise, on this summary judgment record, the court cannot rule, as a matter of law, that Gardner did not act maliciously, that is, with "an intention to vex, injure, or annoy," when it recorded the letters. Mullen, 2015 WL 11071989, at *3 (citing Wilko of Nashua, Inc. v. TAP Realty, Inc., 117 N.H. 843, 848 (1977)). While Gardner makes much of the fact that the 2017 Letter purported to "withdraw" the 2015 Letter, Gardner never recorded a discharge of the 2015 Letter in the registry and in fact, re-recorded the 2015 Letter with the 2017 Letter, leaving both allegedly false letters on the record for the world to see.

Moreover, the registry of deeds is generally not a forum for persons to publish their opinions about lien priority, title claims, or other legal issues. See RSA 478:4 (registry of deeds "shall receive, file and record for the legal charges all original deeds and instruments brought for that purpose"). Recording letters of the sort at issue here, particularly if they turn out to contain false statements, also risks the recorder to exposure to legal claims like slander of title or other penalties. See 478:42 (denoting penalties for fraudulent filings in a registry). Gardner's counsel's actions here were at best an unusual practice and at worst, something more questionable.[69] That Gardner's counsel now says his actions were not malicious does not entitle his client to summary judgment on this claim. That will be an issue for trial or a renewed motion for summary judgment after additional factual development in discovery. At this point in the case and on the present record, a rational factfinder could infer that Gardner recorded the letters to adversarial counsel, on the eve of the Property's foreclosure sale in October 2017, with the

---

[69] See Doc. no. 56-6. It is unclear why Gardner's counsel felt the need to record the letters "to give the world notice of its attachment lien," doc. no. 50, at 20, when he had previously recorded the writ of attachment and thus already put the world on notice of it. See Ex. 6 (doc. no. 38-6). This fact creates some suspicion as to Gardner's motives in recording the letters, further precluding summary judgment on Rubygold's slander of title claim.

improper motive to vex, injure, or annoy the property owner and disrupt the foreclosure sale in some way.

There is also a material dispute as to whether Gardner's recordings caused damage to Rubygold. Gardner focuses on the fact that Centaur and Rubygold purchased the Property notwithstanding the recorded letters and allegedly accounted for Gardner's lien claim in the purchase price, which shows that Rubygold suffered no harm. But Rubygold disputes that argument with an unrebutted affidavit from its sole member.[70] Gardner's argument also ignores Rubygold's alleged damages after it purchased the Property, which include attorneys' fees to try and remove the alleged cloud on its title.[71] In light of these disputes of material fact, Gardner's motion for summary judgment on Count 5 is denied.

### 3. Count 6 – Violation of the Consumer Protection Act

Finally, Gardner moves for summary judgment on Rubygold's CPA claim on three grounds: (1) the alleged wrongful acts do not meet the definition of unfair or deceptive acts or practices; (2) Gardner did not perform the alleged wrongful acts in the ordinary course trade or commerce in New Hampshire; and (3) the alleged slander of title occurred more than three years prior to Rubygold's suit and the suit is therefore untimely. Gardner's timeliness argument has little merit. Even if Gardner's recording of letters in 2015 could be considered "exempt transactions" under RSA 358-A:3, IV-a – and the court does not find that they are exempt – Rubygold's CPA claim is based on Gardner's conduct in 2017, 2019, and 2020, which are clearly not exempt from the Act. The court also disagrees that Gardner's alleged wrongful conduct did

---

[70] See Doc. no. 56-3, at ¶¶ 12-20.

[71] See Doc. no. 56-5, at ¶ 10.

not occur in its ordinary course of trade or commerce in New Hampshire and therefore assumes, for purposes of this order only, that the in-state trade or commerce requirement was met. Rubygold's CPA claim falters, however, on the rascality element and the court agrees with Gardner's first argument that the alleged acts to not meet the definition of unfair or deceptive acts or practices under the statute.

**The rascality test.** The CPA makes it unlawful for any person to "use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within" New Hampshire, including, but not limited to, seventeen discrete actions listed in the statute. RSA 358-A:2, I-XVII. Rubygold does not allege that Gardner committed any of the enumerated acts, but instead argues that Gardner's conduct falls under the general prohibition against unfair methods of competition or unfair or deceptive acts or practices. An act falls under the general proscription if it attains "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Fat Bullies Farm, LLC v. Devenport, 170 N.H. 17, 24 (2017) (quoting George v. Al Hoyt & Sons, Inc., 162 N.H. 123, 129 (2011)). New Hampshire courts often look to courts' "interpretation of the Federal Trade Commission Act for guidance" to determine what actions are unlawful under the statute's catch-all provision. State v. Moran, 151 N.H. 450, 452-53 (2004). These cases determine if actions are unfair or deceptive by inquiring:

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common-law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

Id. at 453.  Additionally, a "series of acts" may become a "course of conduct violative of the CPA when the acts collectively constitute an 'unfair or deceptive act or practice.'"  Fat Bullies Farm, LLC, 170 N.H. at 26 (quoting RSA 358-A:2).

**The alleged unfair or deceptive acts or practices.**  Gardner argues that the alleged deceptive acts or practices fail the rascality test because:  (1) no court has held that the "predicate" acts of abuse of process or slander of title constitute unfair or deceptive acts or practices; (2) Gardner's act of obtaining a writ of execution was authorized by court order and state statute; and (3) recording documents in the registry of deeds that set forth a party's good faith legal position do not attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.  Rubygold rejoins that because Gardner's conduct amounts to attempted extortion and theft by deception under New Hampshire's criminal code, it clearly meets the rascality test.  Gardner has the better of the arguments.

If it is ultimately shown that Gardner's claim of lien priority was meritless and the state court's July 7, 2020 Order was an incorrect and improper basis for granting Gardner's motion for a writ of execution, Rubygold may succeed on its abuse of process or slander of title claims.  But abuse of process or slander of title, and the underlying facts supporting those claims, do not rise to the level of rascality needed to separately support a CPA claim.

In short, publishing a letter outlining a legal position as to lien priority, seeking and obtaining a writ of execution (after complying with a court order to notify Rubygold of its motion) and using that writ and a threat of Sheriff's sale to demand payment from Rubygold would not "raise an eyebrow of someone inured to the rough and tumble of the world of commerce."  Fat Bullies Farm, LLC, 170 N.H. at 24.  Rubygold's bald conclusion that Gardner

31

committed extortion or theft by deception, without evidentiary support or developed argument as to why, is insufficient to create a triable issue of fact that Gardner engaged in the type of severely wrongful conduct necessary to support a CPA claim. See Cherkaoui v. City of Quincy, 877 F.3d 14, 24 (1st Cir. 2017) ("A court will disregard 'conclusory allegations, improbable inferences, and unsupported speculation' in determining whether a genuine factual dispute exists.") (quoting Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009)).

The New Hampshire Supreme Court has held that similar, arguably worse, conduct does not satisfy the rascality test. For example, in Fat Bullies Farm, there was undisputed evidence that a party: (1) showed up unannounced at another party's property with an attorney and a draft option agreement to discuss the sale of the property; (2) did not explain the meaning of the language in the draft agreement; (3) attempted to negotiate a sale price on the spot; (4) misrepresented facts about his intent to use the property after the sale; and (5) did not recommend that the prospective seller obtain legal counsel before signing the agreement. After the seller tried to renege on the agreement, the buyer threatened to sue the seller (both verbally and in demand letters) and cost the seller thousands of dollars in legal fees, told the seller that it would own the property within 24 hours, and impliedly threatened harm in another face-to-face encounter by stating to the seller, "I know where you live . . . You can run by you cannot hide." In the resulting litigation, the buyer pursued a "contentious litigation strategy." 170 N.H. at 20-23, 28. Viewing all of this conduct together, the court still held that it did not satisfy the rascality test. Id. at 28.

If the wrongful conduct proven in Fat Bullies Farm was found to not offend public policy, not be oppressive, immoral, unethical, or unscrupulous, and not cause substantial injury to consumers, then Gardner's alleged conduct does not meet the rascality test either. "[N]ot all

32

conduct in the course of trade or commerce falls within [the Act's] scope," and courts applying the CPA have found that even selfish bargaining and business dealings, unfair and costly litigation tactics, or enforcement of rights through a collection action do not violate the CPA. See, e.g., Barrows v. Boles, 141 N.H. 382, 390 (1996) (selfish bargaining and business dealings not enough to justify damages claim under CPA); Axenics, Inc. v. Turner Constr. Co., 164 N.H. 659, 676-77 (2013) (finding no violation of CPA where the plaintiff alleged the defendant's litigation tactics were "unfair" and were "designed to further delay the adjudication of [the plaintiff's] claim and make the litigation prohibitively expensive"); Turner v. Shared Towers VA, LLC, 167 N.H. 196, 209 (2014) (holding the defendants did not violate the CPA by requiring the plaintiff to honor his obligations under a loan agreement and promissory note, enforcing their rights under those documents by initiating a collection and foreclosure action upon default and rejecting the plaintiff's offer of compromise).

Similarly, while the evidence here may establish that Gardner or its counsel misrepresented facts or opinions in its recorded letters[72] or state court filings, misrepresentations alone do not violate the CPA. Fat Bullies Farm, LLC, 170 N.H. at 27 ("Although the misrepresentation encouraged the [plaintiffs] to sell Runnymede to Fat Bullies, a misrepresentation does not rise to the level of rascality necessary to establish a consumer protection violation merely because it encourages a sale.") And there is no evidence in this record that Gardner or its counsel intentionally misrepresented facts, "knowing [they] lacked

---

[72] Based on the affidavit submitted by Mr. Rubinstein, Rubygold's sole member, he did not appear particularly deterred by Gardner's recorded letters. See Doc. no. 56-3, at ¶¶ 23-26. This too suggests that Gardner's recording of the letters did not attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of real estate transactions.

sufficient knowledge to substantiate them," which can satisfy the rascality test.  Beer v. Bennett, 160 N.H. 171 (2010).  Nor is there evidence that Gardner or its counsel misrepresented facts to avoid an "enforceable contractual obligation."  Fat Bullies Farm, LLC, 170 N.H. at 27; see also State v. Moran, 151 N.H. 450, 453-54 (2004) (holding rascality test was met when trial court could have reasonably found that defendant entered into construction contract with homeowner and then used misrepresentations to induce the homeowner to pay in advance for construction materials "at a time when he clearly did not intend to perform the work").

Here, Gardner recorded letters summarizing its legal position on lien priority after obtaining a writ of attachment from the New Hampshire Superior Court.  While that legal position may ultimately prove to be incorrect, there is no evidence in this record that Gardner knew its position was untrue or meritless at the time it recorded the letters.  Gardner later moved for and obtained a writ of attachment, complied with court orders to notify Rubygold of its motion, and sent the order granting its motion with a demand letter to Rubygold seeking payment.  Rubygold rejected Gardner's demand and, unlike the party in Fat Bullies Farm, Gardner has not acted on the threats in its demand letter.  No rational factfinder can conclude that this course of conduct offends established public policy, is immoral, unethical, oppressive, or unscrupulous, or causes substantial injury.  Gardner's motion for summary judgment as to Count 6 of Rubygold's complaint is therefore granted.

## IV.    Conclusion

For the reasons set forth above, Rubygold's motion for partial summary judgment[73] as to Count 2 is DENIED, and Gardner's motion for summary judgment[74] is GRANTED as to Counts 1-3 and 6, and DENIED as to Counts 4 and 5.  Gardner's motion to dismiss[75] is DENIED as moot.

**SO ORDERED**.

_____
Joseph N. Laplante
United States District Judge

Dated:  July 2, 2021

cc:    Edmond J. Ford, Esq.
       Marc W. McDonald, Esq.
       W. E. Whittington, Esq.

---

[73] Doc. no. 40.

[74] Doc. no. 49.

[75] Doc. no. 10.